IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


MARY JO PULLEN-HUGHES

        Plaintiff,

                                          3:11-cv-01271-PK

                                          FINDINGS AND
v.                                        RECOMMENDATION


PARRIS LaCARIA, individually; JOSEPH
LUIZ, individually; DAVID NOORDELOOS,
individually; CLIFFORD HOECKER,
individually; ANNA ZEIGER KEPHART,
individually; ELIZABETH EAMES,
individually; JENNA PLANK, individually;
DAVID WOBORIL, individually; DALE
HOSKINS, individually; ERIC WALSTROM,
individually; JOHN DOES 1-3, individually;
CITY OF PORTLAND, a municipality; CITY
OF GRESHAM, a municipality;

        Defendants.

PAPAK, Magistrate Judge:

        Plaintiff Mary Jo Pullen-Hughes brings this action arising out of her arrest, prosecution,

and acquittal on criminal charges of Telephonic Harassment following several calls she made to

the Department of State and Department of Defense. (#53.) Pullen-Hughes alleges claims under

42 U.S.C. §1983 for violations of her First, Fourth, and Fourteenth Amendment rights, as well as

Page 1 - FINDINGS AND RECOMMENDATION

a state law claim for malicious prosecution. *Id.* Now before the court are defendants Eames and Plank's motion to dismiss (#74), and defendants Luiz and Woboril's motion to dismiss (#77) and alternative motion for summary judgment (#77.) For the reasons discussed below, Eames and Plank's motion to dismiss should be granted, Luiz and Woboril's motion to dismiss should be granted, and Luiz and Woboril's alternative motion for summary judgment should be denied as moot.

## FACTUAL BACKGROUND

Pullen-Hughes' first amended complaint concerns events surrounding her November 2009 arrest for Telephone Harassment. Pullen-Hughes is known as a "frequent nuisance caller" to the Portland, Oregon FBI office. (First Amend. Compl., #53, ¶24.) In January 2009, Pullen-Hughes several times called United States Ambassador to the United Nations Susan Rice at her home, leaving what Ambassador Rice described as "harassing voice messages." *Id.* at ¶¶17-19. Pullen-Hughes also called Ambassador Rice's husband at his work. *Id.* at ¶19. The Protective Intelligence Investigations ("PII") of the Department of State Diplomatic Security Service began to coordinate with other federal agencies to interview Pullen-Hughes, but abandoned the attempt after she ceased calling Ambassador Rice. *Id.* at ¶¶20-21.

Approximately eight months later, in early August 2009, Pullen-Hughes called then-United States Secretary of Defense Robert Gates at his residence and spoke with Gates' son. *Id.* at ¶22. The Department of Defense's Pentagon Force Protection Agency immediately sent an agent, defendant Parris LaCaria, to Portland to investigate. *Id.* at ¶23. LaCaria and defendant Dale Hoskins, a Beaverton Police Department detective, visited Pullen-Hughes' residence and told her not to call Secretary Gates' home, the Pentagon, or the Department of Defense; Pullen-

Hughes said she would call whomever she pleased. *Id.* at ¶25. LaCaria asked an Assistant United States Attorney for the District of Oregon to prosecute Pullen-Hughes, but he declined. *Id.* at ¶26. Around the same time, the State Department's security service began to draft a cease and desist letter informing Pullen-Hughes that her calls to government personnel at their homes and offices were harassing and threatening, and demanding that she cease such contact or face civil and/or criminal complaints. *Id.* at ¶27.

In late September 2009, Pullen-Hughes again called Ambassador Rice's home. *Id.* at ¶28. Ambassador Rice hung up on Pullen-Hughes, but Pullen-Hughes called back and left a message that the Ambassador considered "menacing." *Id.* This call prompted the United States Joint Terrorism Task Force to begin investigating Pullen-Hughes by gathering information from local and national law enforcement agencies. *Id.* at ¶29. On October 2, 2009, Special Agent David Noordeloos of the Joint Terrorism Task Force met with Multnomah County Deputy District Attorney Jenna Plank and City of Portland Deputy City Attorney David Woboril about applying criminal telephonic harassment statutes to Pullen-Hughes. *Id.* at ¶30. Noordeloos apparently discussed the cease and desist letter drafted earlier by the Department of State, and Plank and Woboril "agreed" with the letter, suggesting it be delivered to Pullen-Hughes in person and sent by certified mail. *Id.*

Less than a week later, on October 7, 2009, Noordeloos and Portland Police Bureau detective Joseph Luiz served the cease and desist letter on Pullen-Hughes at her residence. *Id.* at ¶31. The cease and desist letter provided[1]:

---

[1] Even on a motion to dismiss the court may consider documents whose contents are alleged in a complaint but not attached, and whose authenticity is not debated. *Parrino v. FHP, Inc.*, 146 F.3d 669, 706 (9th Cir. 1998).

Page 3 - FINDINGS AND RECOMMENDATION

> This CEASE AND DESIST letter is to inform you that the phone calls you placed to the office and private residence of Ambassador Susan Rice and her family during the months of January and September 2009 are considered harassing and intimidating. Contacting U.S. Department of State personnel (to include contractors, nominated officials awaiting confirmation, and/or former officials) or their family members in this manner is unacceptable activity.
>
> The purpose of this letter is to demand that your phone calls and other attempted contact to Ambassador Rice, her family and other U.S. Department of State personnel (as defined above) CEASE AND DESIST immediately. Should you continue to pursue these activities in violation of this CEASE AND DESIST letter, we will not hesitate to pursue further legal action against you, including, but not limited to, civil action and/or criminal complainst to the extent permitted by law.

(Pl.'s Resp., #83, Ex. 3.) The letter also included an email and mailing address for further correspondence. *Id.* Noordeloos told Pullen-Hughes she could contact the State Department's Protective Intelligence Investigations by mail or email at the addresses listed on the cease and desist letter, but warned her not to contact any State Department employees, former employees, contractors or nominees awaiting Senate confirmation. (First Amend. Compl., #53, ¶31.) Pullen-Hughes received a copy of the letter by certified mail the same day. *Id.* at ¶32.

Despite Noordeloos' warning, later the same day Pullen-Hughes called the Department of State's Operations Center to complain that federal agents had harassed her at her residence. *Id.* at ¶¶33, 73. She also called the Department of State Diplomatic Service's Office of Assistant Secretary three times. *Id.* at ¶34. The next day, on October 8, 2009, Pullen-Hughes called the Department of State's Office of Inspector General to report she had been harassed by federal agents. *Id.* at ¶¶35,73.

A little over a month later, on November 10, 2009, Pullen-Hughes called the Department of Defense and spoke to a secretary, Joyce Grant, claiming she had information about an upcoming terrorist attack. *Id.* at ¶¶36, 73. After hearing about Pullen-Hughes' call to the

Page 4 - FINDINGS AND RECOMMENDATION

Department of Defense, Pentagon Force Protection LaCaria contacted the Portland Police Bureau and requested that law enforcement conduct a welfare check at her residence in Gresham, Oregon and "take appropriate police action." *Id.* at ¶37. LaCaria also spoke with a Gresham Police officer, explaining that Pullen-Hughes had contacted the Department of Defense despite being told many times not to call and that the Department of Defense was willing to "take action" against Pullen-Hughes for Telephonic Harassment. *Id.* at ¶38. Based on that communication, a Beaverton Police office arrested Pullen Hughes. *Id.* at ¶40. She was later charged with three counts of violating Or. Rev. Stat. § 166.090(b), Telephonic Harassment, for her October 7 and 8, 2009 calls to the Department of State and her November 10, 2009 call to the Department of Defense. *Id.* at ¶42.

The Multnomah County District Attorney dismissed the counts pertaining to the October 7th and 8th calls. *Id.* at ¶44. At trial, the Department of Defense secretary who spoke with Pullen-Hughes on November 10th testified that Pullen-Hughes was polite during their ten to fifteen minute conversation and that she did not feel annoyed or harassed. *Id.* at ¶47. At the end of her bench trial, Pullen-Hughes was acquitted. *Id.* at ¶49.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, a complaint must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.* (citation omitted). Instead, "for a complaint to survive a motion to dismiss, the non-

conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009), (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In ruling on a Rule 12(b)(6) motion to dismiss, a court must take the complaint's allegations of material fact as true and construe them in the light most favorable to the nonmoving party. *Kearns v. Tempe Tech. Inst.*, 39 F.3d 222, 224 (9th Cir. 1994). Moreover, the "court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

## DISCUSSION

Pullen-Hughes alleges five claims for relief in this action, only three of which are at issue here. The motions before the court pertain to Pullen-Hughes' state law claim for malicious prosecution (Second Claim) against Eames, Plank, Luiz, and Woboril, her Section 1983 claim for violation of her Substantive Due Process rights (Third Claim) against Eames, Plank, Luiz, and Woboril, and her Section 1983 claim for retaliation based on exercise of her First Amendment free speech rights (Fourth Claim) against Eames, Plank, and Woboril.[2] As an initial matter, Pullen-Hughes makes several concessions that narrow the issues to be decided. She has voluntarily dismissed defendant Eames, who prosecuted her Telephonic Harassment charges for the Multnomah County District Attorney. (#96.) She also has withdrawn all allegations against Deputy District Attorney Plank pertaining to her issuance of the Information charging Pullen-Hughes, amended her state law malicious prosecution claim to allege compliance with the

---

[2] Not at issue are Pullen-Hughes' Section 1983 claim for unconstitutional seizure (First Claim), and *Gibson* claim for retaliatory arrest (Fifth Claim).

Oregon Tort Claims Act, and substituted Multnomah County as a defendant instead of Plank on

that claim. (Second Amend. Compl., #99.)

What remains to be decided is the viability of Pullen-Hughes' Section 1983 Substantive

Due Process claim against district attorney Plank, city attorney Woboril, and Portland police

officer Luiz, and her Section 1983 First Amendment Retaliation claim against Plank and

Woboril. Plank makes only a qualified immunity argument, while Woboril and Luiz both attack

Pullen-Hughes' pleadings on the merits and assert qualified immunity. Woboril and Luiz also

make an alternative motion for summary judgment, should the court determine the pleadings are

sufficient. I conclude that Pullen-Hughes' Section 1983 claims fail to state a claim against these

defendants and that these defendants are entitled to qualified immunity based on the allegations

in the complaint. I need not, therefore, consider Woboril and Luiz' alternative motion for

summary judgment.

## I.    Section 1983 Substantive Due Process

"Substantive due process protects individuals from arbitrary deprivation of their liberty

by government." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). A substantive due

process claim requires proof of two requirements. *Id.* First, because there is no general liberty

interest in being free from capricious government action, a plaintiff must establish "a government

deprivation of life, liberty, or property." *Id.* (quoting *Squaw Valley Dev. Co. v. Goldberg*, 375

F.3d 936, 948 (9th Cir. 2004)). Second, a plaintiff must show an executive abuse of power

"which shocks the conscience." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846

(1998)).

Although Pullen-Hughes does not expressly state whether she was deprived of life,

liberty, or property, a liberal reading of her complaint indicates that the government allegedly

infringed her liberty interest by arresting and prosecuting her and her property interest by

requiring her to pay a fee for her indigent defense.  Regarding the second element, Pullen-

Hughes' complaint alleges that Plank, Woboril, and others "were active participants in initiating

and continuing unfounded criminal proceedings" against Pullen-Hughes, "brainstorming and

hatching a plan" to deliver a cease and desist letter to Pullen-Hughes, and by doing so, ensuring

that all the elements of Telephonic Harassment would be met for her eventual prosecution.  (First

Amend. Compl, #¶65.)  Luiz allegedly "furthered the prosecution" of Pullen-Hughes by

"delivering the Cease and Desist letter to her residence."  *Id.*

Pullen-Hughes' allegations and reasonable inferences taken from them do not plausibly

suggest that defendants engaged in conduct that would shock the conscience.  The facts alleged

in Pullen-Hughes' complaint do not indicate that Plank and Woboril actually plotted to initiate a

meritless criminal prosecution against Pullen-Hughes.  The cease and desist letter seems to be

key to Pullen-Hughes' theory– she apparently asserts that defendants crafted the overly broad

letter and had it served so as to establish all the preliminary elements of telephone harassment

under Or. Rev. Stat. 166.090, particularly the requirement that the caller must make a telephone

call "knowing that the caller has been forbidden from so doing by a person exercising lawful

authority over the receiving telephone."  Or. Rev. Stat. §166.090(1)(b).[3]  But the facts plead do

---

[3] Or. Rev. Stat. 166.090(1) provides:
A telephone caller commits the crime of telephonic harassment if the caller intentionally
harasses or annoys another person:

(a) By causing the telephone of the other person to ring, such caller having no
communicative purpose;

not even plausibly indicate that Plank and Woboril "hatched" any plan pertaining to the cease and desist letter, since they first became involved in the case in October 2009, at least a month after the State Department's security service began drafting the cease and desist letter warning plaintiff not to make further calls. Moreover, Plank and Woboril's alleged conduct– "agreeing" with the cease and desist letter and suggesting it be delivered to Pullen-Hughes in person and sent by certified mail– hardly suggests a concerted effort to initiate a false prosecution. *Id.* At most, the complaint plausibly implies that Plank and Woboril advised a federal agent that a future telephone harassment prosecution would be strengthened if there was reliable documentation showing the caller had been notified beforehand not to persist in the harassing conduct.

Most importantly, even if Plank and Woboril knew that the federal agent wanted to lay the groundwork for a potential future prosecution under the telephone harassment statute and assisted him in that lawful objective, it is implausible that Plank and Woboril knew that the prosecution would be *unfounded*. As the complaint explains, Pullen-Hughes was ultimately acquitted in part because she was charged with telephone harassment for her call to the Defense Department that the secretary there did not find to be harassing or annoying. At the time Plank and Woboril allegedly "agreed" with the cease and desist letter, they had no way of knowing what calls Pullen-Hughes might make in the future and whether those calls would satisfy the

---

        (b) By causing such other persons telephone to ring, knowing that the caller has been forbidden from so doing by a person exercising lawful authority over the receiving telephone; or

        (c) By sending to, or leaving at, the other persons telephone a text message, voice mail or any other message, knowing that the caller has been forbidden from so doing by a person exercising lawful authority over the receiving telephone.

elements of telephone harassment sufficient for prosecution.  It is therefore highly implausible that Woboril, Plank and others hatched a plot to launch a meritless prosecution against Pullen-Hughes, laying the groundwork with the already-drafted cease and desist letter.

It is even more farfetched to think that Luiz's alleged presence during service of the cease and desist letter is behavior shocking the conscience.  Even assuming it were plausible that Woboril and Plank plotted to falsely prosecute Pullen-Hughes, Luiz's presence during service of the cease and desist letter without any knowledge of the "plot" would hardly shock the conscience.  In sum, Pullen-Hughes fails to state a Substantive Due Process claim upon which relief can be granted against Plank, Woboril and Luiz.

## II.    Section 1983 First Amendment Retaliation

The same conclusion holds for Pullen-Hughes' First Amendment retaliation claim.  To demonstrate retaliation in violation of the First Amendment, a plaintiff must prove two elements: (1) "defendants took action that would chill or silence a person of ordinary firmness from future First Amendment activities;" and (2) "defendants' desire to cause the chilling effect was a but-for cause of defendants' action." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900–01 (9th Cir. 2008).   A plaintiff cannot state a claim for retaliatory arrest or prosecution in violation of the First Amendment if the charges were supported by probable cause.  *Hartman v. Moore*, 547 U.S. 250 (2006); *Beck v. City of Upland*, 527 F.3d 853, 863–64 (9th Cir. 2008) ("under *Hartman*, if a plaintiff can prove that the officials secured his arrest or prosecution without probable cause and were motivated by retaliation against the plaintiff's protected speech, the plaintiff's First Amendment suit can go forward.").

Pullen-Hughes alleges that Plank and Woboril[4] initiated and continued an unfounded criminal prosecution against her in retaliation for her constitutionally protected activity, namely the October 7 and 8, 2009 calls to the State Department reporting being harassed at home by federal agents and her November 10, 2009 call to Defense Department providing information about a future terrorist attack.[5]  (First Amend. Compl., #53, at ¶¶ 69, 73-74).  Woboril argues that Pullen-Hughes fails to state a claim for First Amendment harassment because her own allegations indicate that probable cause existed for her prosecution for telephone harassment. Woboril provides little explanation for his position beyond his bare citation to *State v. Koenig*, 238 Or. App. 297, 304, 242 P.3d 649, 653 (2010).  In *Koenig,* the Oregon Court of Appeals affirmed a conviction for telephone harassment, concluding that a reasonable juror could have found defendant intended to harass or annoy the Office of Washington County Counsel and the

_____

[4] I analyze whether this claim is properly plead with respect to both Woboril and Plank, even though Plank only asserts qualified immunity.

[5] Pullen-Hughes' briefing and oral argument frames the issue somewhat differently, asserting that the cease and desist letter itself amounted to retaliation for her prior First Amendment activity of frequent calls to government agencies.  Pullen-Hughes suggests the cease and desist letter was worded too broadly, prohibiting Pullen-Hughes from engaging in constitutionally protected speech such as calling government officials at their offices to report potential terrorist activities.  For the purposes of this motion, I evaluate the sufficiency of the allegations in the complaint, not Pullen-Hughes' reformulation of her allegations and her legal theory, as seen in her briefing.
But even if the court were to analyze the cease and desist letter itself as the allegedly unconstitutional conduct, no different result would obtain.  As discussed more thoroughly below, an individual does not possess the unrestricted right to telephone government officials at their homes or offices in any manner she pleases.  Indeed criminal telephone harassment statutes are constitutional when they prohibit calls made with the specific intent to harass.  Similarly, the cease and desist letter here restricted Pullen-Hughes from calling State Department personnel at their homes or offices in a "manner" that is "considered harassing and intimidating."  (Pl.'s Resp., #83, Ex. 3.)  The cease and desist letter therefore placed an apparently constitutional limitation on the manner of Pullen-Hughes' speech activities.

Page 11 - FINDINGS AND RECOMMENDATION

Washington County Sherriff's Office when he continued calling those agencies, even after receiving letters forbidding him from calling there due to the increasingly disruptive and time-consuming nature of his calls. *Id.* at 299, 304. The Court of Appeals relied on "the frequency and length of defendant's calls after receiving the letters forbidding him from calling, the content of those calls, and, most significantly, defendant's own testimony at trial," none of which are fully described in the opinion. *Id.*

Pullen-Hughes' complaint does not affirmatively allege that defendants lacked probable cause for her prosecution. She argues, however, that the complaint reasonably raises that inference, since it contains allegations that the two calls in October were to report her purported harassment by federal agents and that the recipient of the November call did not feel annoyed or harassed. Although those allegations shed light on why the District Attorney's case against Pullen-Hughes ultimately failed, they are not probative of whether the there was probable cause to arrest and prosecute her in the first place.

Probable cause exists when, under the totality of the circumstances, "a prudent person would have concluded that there was a fair probability" that a crime had been committed. *United States v. Smith*, 790 F2d 789, 792 (9th Cir. 1986); *see also United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005). "Probable cause does not require specific evidence of every element of an offense." *United States v. Thornton*, 710 F2d 513, 515 (9th Cir. 1983). But, "when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." *Gasho v. United States*, 39 F3d 1420, 1428 (9th Cir. 1994).

Here, the complaint indicates that Pullen-Hughes was warned in-person on August 11,

2009 by Agent LaCaria not to call the Department of Defense and warned in-person on October

7, 2009 by Agent Noordeloos not to call the Department of State.  (First Amend. Compl., #53, at

pp 25, 31).  She was also provided an alternative mailing address and email address through

which to contact to reach the Department of State.  *Id.* at ¶31.  Nevertheless, the same day she

received that warning she called the Department of State four times.  *Id.* at ¶34.  She also called

the Department of Defense.  *Id.* at ¶36.  Based on these allegations alone it is almost certain that

defendants possessed probable cause to arrest and prosecute Pullen-Hughes for violations of Or.

Rev. Stat. § 166.090(1).   There would have been no question that Pullen-Hughes, "caus[ed] such

other person's telephone to ring, knowing that the caller has been forbidden from so doing by a

person exercising lawful authority over the receiving telephone." Or. Rev. Stat. § 166.090(1)(b).

And, a prudent person would have concluded that there was at least a fair probability that Pullen-

Hughes made the calls with the specific intent to annoy or harass, as required by Or. Rev. Stat. §

166.090(1), given the temporal proximity between the in-person warnings from federal agents

not to make such calls and the calls themselves, as well as Pullen-Hughes' insistence that she

would continue to call "whomever she wanted."  (First Amend. Compl., #53, at 31.)   In sum,

Pullen-Hughes cannot allege a lack of probable cause simply by pointing to facts that led to her

eventual acquittal.  The allegations in her complaint indicate that defendants possessed probable

cause to arrest and prosecute her *at the time* of her arrest and prosecution, even if later

investigation and testimony revealed that she did not violate Or. Rev. Stat. § 166.090(1).

Moreover, even aside from the probable cause analysis, the complaint does not contain

allegations from which it is reasonable to infer that Plank and Woboril possessed a desire to chill

Pullen-Hughes' First Amendment rights.   Merely conferring with a visiting law enforcement

officer and concurring with his plan of serving a cease and desist letter hardly creates an inference of retaliatory intent. This is especially so when the cease and desist letter does not set out a blanket restriction on First Amendment activities, but instead limits the *manner* in which an individual may communicate with employees of a federal agency by restricting telephone calls made in an harassing and intimidating fashion but preserving mail and email privileges. Therefore, Pullen-Hughes fails to properly plead a claim for First Amendment retaliation against defendants Plank and Worboril.

III.    **Qualified Immunity**

Defendants Plank, Woboril, and Luiz all argue that the defense of qualified immunity bars Pullen-Hughes' Section 1983 claims. To determine whether qualified immunity bars a plaintiff's suit, courts ordinarily employ the sequential analysis set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). First, the court determines whether the facts alleged by plaintiff, taken in the light most favorable to plaintiff, establish a constitutional violation. *Id.* at 201. If no constitutional right would have been violated under the facts alleged, the analysis ends. *Id.* If a violation could be established under the facts alleged, the court then considers whether the right allegedly violated was clearly established. *Id.* Courts, however, can "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As explained above, even reading plaintiff's allegations favorably, she cannot make out a Section 1983 Substantive Due Process claim against Plank, Worobil, or Luiz, nor a Section 1983 First Amendment Retaliation claim against Plank or Worobil. Thus, the qualified immunity

Page 14 - FINDINGS AND RECOMMENDATION

analysis necessarily ends and defendants need not resort to assertions of qualified immunity.

Even assuming *arguendo* that the complaint properly states those claims, Pullen-Hughes' right to call the Department of State in October 2009 and the Department of Defense in November 2009 was not clearly established, in light of her prior history of contacting officials in those agencies. Both sides propose overly simplistic formulations of the constitutional principles at issue. Defendants argue that Pullen-Hughes had no constitutional or statutory right to harass others by telephone. As a general principle, I agree that harassment, even if it takes the form of speech, is not constitutionally protected speech. *See Thorne v. Bailey*, 846 F.2d 241, 243 (4th Cir. 1988). But defendants' position begs the question, presuming that Pullen-Hughes' calling amounted to harassment. Pullen-Hughes, by contrast, asserts that it "is unquestionable that citizens of the United States have the right– and arguably a *duty*– to question their government and inform the government and its officials of information they believe could save the lives of others." (P.'s Br., #82, at 5.) Pullen-Hughes' position is equally unpersuasive, since harassment occurring under the guise of giving tips to the government could still exceed the scope of First Amendment protection.

Importantly, I cannot find any case directly addressing the limits on a private citizen's First Amendment right to telephone government officials. However, many courts have discussed the constitutionality of criminal statutes prohibiting telephone harassment, indirectly illustrating the line separating free speech and telephone harassment of government employees. As the Fifth Circuit explained:

> Courts have made a distinction between communication and harassment. The difference is one between free speech and conduct that may be proscribed. Although restrictions based upon conduct may incidentally restrict speech, the courts have found that such a restriction poses only a minimal burden on speech.

Page 15 - FINDINGS AND RECOMMENDATION

*Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005) (internal citations omitted). Thus, statutes criminalizing use of the telephone to harass another do not violate the First Amendment, so long as the statute requires a specific intent to harass. *See Thorne*, 846 F.2d at 244 (analyzing the federal statute and similar West Virginia statute).

Case law also suggests that harassing telephone calls placed to government officials do not enjoy any greater protection than similar calls made to private citizens. Although not raised here by plaintiff, the Petition Clause of the First Amendment guarantees "the right of the people ... to petition the Government for a redress of grievances," which speaks to a citizen's right to contact a government official about perceived government misconduct. U.S. Const. amend. I. However, the right to petition "does not enjoy a special status among the First Amendment guarantees, since it 'was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble,'" and is subject to the same analysis as the right to free speech generally. *Thorne*, 846 F.2d at 244, 245 n.6, (quoting *McDonald v. Smith*, 472 U.S. 479, 482 (1985)).

Finally, century-old Supreme Court precedent recognizes the right and duty of a citizen "to communicate to the executive officers any information which he has of the commission of an offense against those laws [pertaining to breach of the peace of the United States]." *In re Quarles*, 158 U.S. 532, 535 (1895). This right derives from "the creation and establishment by the constitution itself of a national government, paramount and supreme within its sphere of action," not any particular constitutional amendment. *Id.* While a private citizen reporting a crime enjoys an absolute privilege against suit for slander and libel, *id.*, I find no authority suggesting this right supercedes criminal statutes prohibiting telephone harassment or provides

any other form of heightened constitutional protection. At the very least, the law nowhere clearly

articulates the precise boundary of constitutionally protected free speech in the context of

repeated and unwelcome telephone calls reporting crimes to government officials. This lack of

clear authority alone satisfies the second prong of the qualified immunity test. *See Hope v.*

*Pelzer*, 536 U.S. 730 (2002) (prior case law must give the government official clear warning that

the official's conduct is unlawful). Accordingly, even had Pullen-Hughes properly stated claims

for violations of Substantive Due Process and First Amendment Retaliation resulting from

defendants Plank, Woboril, and Luiz' alleged conduct here, these defendants would enjoy

qualified immunity from suit.

## CONCLUSION

For the foregoing reasons, defendants Eames and Plank's motion to dismiss (#74) should

be granted, defendants Luiz and Woboril's motion to dismiss (#77) should be granted, and

defendants Luiz and Woboril's alternative motion for summary judgment (#77) should be denied

as moot.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any,

are due fourteen (14) days from service of the Findings and Recommendation. If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

///

///

If objections are filed, then a response is due fourteen (14) days after being served with a

Page 17 - FINDINGS AND RECOMMENDATION

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 2nd day of October, 2012.

Honorable Paul Papak
United States Magistrate Judge